IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 18, 2025

**STATE OF TENNESSEE v. ANTONIO D. BENNETT TATE**

**Appeal from the Circuit Court for Blount County**
**No. C-29114 Tammy M. Harrington, Judge**

————————————————————

**No. E2025-00699-CCA-R3-CD**

————————————————————

The Defendant, Antonio D. Bennett Tate, appeals from the Blount County Circuit Court revocation of his community corrections sentence. On appeal, the Defendant argues that the trial court erred by improperly admitting video footage from a police officer's body-worn camera during the revocation hearing. Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

STEVEN W. SWORD, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Rick A. Owens (on appeal); and Douglas P. Nanney[1] (at trial), Maryville, Tennessee, for the appellant, Antonio D. Tate.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; Ryan Desmond, District Attorney General; and Tiffany Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant, Antonio D. Bennett Tate, came before the Circuit Court for Blount County, Tennessee, on a warrant alleging that he violated the rules of his community corrections program by committing aggravated assault. The warrant was subsequently amended by adding an allegation that he also violated an order of protection. The trial

---

[1] The court notes that Mr. Nanney passed away on December 5, 2025. He was known for his care and concern for his clients. We take this opportunity to express our condolences to his family and friends.

court revoked his community corrections sentence after a hearing.  The Defendant now appeals from that order.

## I.     FACTUAL AND PROCEDURAL HISTORY

On October 27, 2023, the Defendant entered a guilty plea to unlawful possession of a weapon by a convicted felon with an agreed-upon sentence of fifteen years as a Range II, multiple offender, and to felony reckless endangerment by firing into an occupied habitation with an agreed-upon sentence of three years as a Range I, standard offender to be served consecutive to the first count for a total effective sentence of eighteen years.  The parties further agreed that service of the sentence would be on community corrections pursuant to the Tennessee Community Corrections Act of 1985, codified in Tennessee Code Annotated section 40-36-101 *et seq*.

On December 2, 2024, the Defendant's community corrections officer, Kenneth Vanderpool, obtained a warrant alleging that the Defendant violated Rule #11 of his community corrections rules by committing aggravated assault on December 1, 2024.  Mr. Vanderpool obtained an amendment to the violation warrant on December 18, 2024, further alleging that the Defendant violated Rule #11 of his community corrections rules by violating an order of protection.

The trial court held an evidentiary hearing on April 14, 2025.  Mr. Vanderpool testified that he worked as a community corrections officer for the East Tennessee Human Resources Agency and served as the supervisor for the Defendant's community corrections sentence.  He stated that the Defendant had "no major issues" while on community corrections until December 1, 2024, when he was arrested for domestic aggravated assault.  The Defendant was subsequently charged on December 4, 2024, with two counts of violating an order of protection while in custody by contacting a victim by telephone from the Blount County jail.

State's witness Marilyn Kirchoff[2] testified that she had been in a romantic relationship with the Defendant for ten years, which ended in October 2024.  She stated that she and the Defendant unsuccessfully attempted to work on the relationship in November 2024.  She explained that the Defendant lived in her home "on and off" during the time of the offense.

Marilyn Kirchoff explained that she became upset with the Defendant on December 1, 2024, believing he had lied to her the day before.  After work, she drank alcohol with

---

[2] Because Marilyn Kirchoff and Myra Kirchoff share the same surname and were both witnesses to this proceeding, we will refer to them by their first names and surnames for clarity.

her coworkers and became intoxicated. She called a friend who gave her a ride home. When she arrived, she confronted the Defendant with her belief that he had lied to her and told him she did not want him in her home. She testified that she "kept picking and yelling and screaming until he finally decided to talk about it." The two began arguing. During the argument, the Defendant became upset and hit and broke a clock on the wall, which resulted in his cutting his hand. Marilyn Kirchoff stated that blood "went everywhere," including onto the new couch and carpet the Defendant had purchased for her. This made her "more upset." She stated that she "continued to talk bad about him" in an attempt to prompt the Defendant to talk to her until she noticed that the Defendant was also "getting upset." Marilyn Kirchoff testified that she then stopped talking and refused to look at the Defendant or speak to him.

Marilyn Kirchoff agreed that she sent text messages to her sister, Myra Kirchoff, during this encounter. Although she did not remember what she had said in the first text message, it prompted her sister to call her on the house phone to "make sure [she] was okay." After they spoke on the phone, Marilyn Kirchoff sent another text message to her sister, stating that she should call the police if she texted her again. Marilyn Kirchoff explained that she gave this instruction to her sister "[b]ecause [she and the Defendant] were arguing really bad when the clock got busted . . . [and she] kinda got nervous." Myra Kirchoff eventually called the police.

The Defendant left the home to take a walk, and Marilyn Kirchoff locked the door. When the police responded to the home, Marilyn Kirchoff told them that the Defendant had her keys and ring and that she wanted them returned. She testified that she told the police that she was glad they were there "[b]ecause [she] wasn't going to stop arguing." She stated she did not tell the police or her sister that she was drunk or had been drinking. The police placed the Defendant in handcuffs after speaking with him and removed him from the scene. When asked why the police arrested the Defendant, Marilyn Kirchoff stated that she thought he may have had her gun. She said she thought this because she kept a gun on a tray in her living room, and she noticed it was missing. She did not remember if she told her sister about the gun because she "didn't want to talk on the house phone in front of him." However, she stated during cross-examination that she later found her gun in a barn she used for storage on her father's property.

Marilyn Kirchoff indicated that she did not recall what she told the police officers. The State asked her whether it would help her to watch the video from the officer's body-worn camera, but she said she had already watched it twice. Trial counsel objected when the State attempted to play the video, arguing that the witness had already watched the video twice, that watching it again would not "help her recall anything," and that it was not proper refreshing of recollection. The State argued that playing the video was appropriate under Tennessee "Rule [of Evidence] 613" because the witness had an opportunity to

explain her statement. The State also argued that the video "fits under [Tennessee Rule of Evidence] 806, which is attacking her credibility, as well as [Tennessee Rule of Evidence] 803 for a prior inconsistent statement[.]" The trial court found that the witness was reluctant to answer questions, that it would be improper to introduce the video through the officer, and permitted the video to be played through Marilyn Kirchoff's testimony. The video was admitted as an exhibit to the hearing over the Defendant's objection. After watching the video, Marilyn Kirchoff testified that she was intoxicated and nervous while interacting with the officers.

Marilyn Kirchoff acknowledged that the Defendant called her "five or six times" on her previous phone number after his arrest. She said it would not surprise her if he also called her seven times on her new phone number after the arrest because she was the only person he knew in Tennessee. She testified that she did not remember what they discussed during the phone calls, but she stated they did not argue. She did not remember the Defendant asking her not to appear in court.

During cross-examination, Marilyn Kirchoff stated that the Defendant never told her he was going to kill her, although she conceded that she told the police he did. However, she acknowledged that she felt afraid of him at that time. She stated that she did not seek an order of protection against the Defendant and that she wanted the State to drop the charges.

Myra Kirchoff testified that she was Marilyn Kirchoff's sister. Through her testimony, the State introduced the following text message exchange, which Myra described as being between herself and Marilyn:

| Myra: | What's going on? |
| | Are you ok? |
| | |
| Marilyn: | No[.] |
| | I might need you to call the cops [M]ann[3] is acting crazy[.] |
| | But I didn't want to say it on the house phone[.] |
| | |
| Myra: | Send me your location!! |
| | |
| Marilyn: | [Street address of location sent]. |
| | He has my gun and won't give me my keys[.] |

---

[3] Marilyn Kirchoff testified that she typically referred to the Defendant by his nickname, "Mann."

- 4 -

Myra:          Ok you want me to call now?

Marilyn:       Are you calling them[?]
               Give me 5
               Minutes[.]
               He busted my clock on the wall[.]

Myra:          I'm calling at 4:50[.]

Marilyn:       Before you do text me[.] [H]e's acting like he's going
               to leave[.]
               I don't want them to come if he's leaving[.]

Myra:          Ok well tell me when you want me to[.]

Marilyn:       Okay I will please watch your phone[.]

Myra:          I am[.]

Marilyn:       I can't protect myself[.]

Myra:          You want me to call?
               I'm calling
               Marilyn[.]

Marilyn:       Call them now[.]
               Now[.]
               Now[.]

Myra:          I already did[.]


Myra Kirchoff agreed that she called the police during her conversation with her sister. She also testified that she knew the Defendant and Marilyn Kirchoff to become physically violent with one another during their relationship.

The Stated entered, without objection, an Order Granting Bail for Abuse Cases dated December 1, 2024, signed by the Defendant on the same date at 7:48 p.m. The order prohibited the Defendant from "harassing, annoying, telephoning, contacting or otherwise communicating with [Marilyn Kirchoff]."

- 5 -

Investigator Reyburn Angus testified that he worked for the Blount County Sheriff's Office, assigned to the Corrections Division. After reviewing the City Tele Coin records from the jail, Investigator Reyburn determined that the Defendant made thirteen telephone calls to Marilyn Kirchoff, in violation of the no-contact bail condition. Recordings of some of these calls were introduced as exhibits without objection.

After hearing arguments from counsel, the trial court found that the State had proven by a preponderance of the evidence that the Defendant had "at the very least" committed misdemeanor assault and that "[t]here's more than enough evidence . . . to prove the aggravated assault charge." The trial court also rejected defense counsel's argument that the Defendant and Marilyn Kirchoff had a "First Amendment right[] to talk to each other, to associate with each other," and found that the State had also established that the Defendant violated his community corrections rules by contacting the victim. The trial court then discussed the consequences for the violations and ultimately revoked the Defendant's community corrections placement and ordered him to serve the balance of his sentence in incarceration.[4] This timely appeal followed.

## II. ANALYSIS

On appeal, the Defendant argues that the trial court erred by improperly admitting video footage from a police officer's body-worn camera during the revocation hearing. He argues that this allowed the State to impeach its own witness, who was neither requested nor permitted to be treated as a hostile witness. He further argues that without said extrinsic evidence, there was insufficient evidence to establish that the Defendant violated the rules of his community corrections sentence. The State responds that the Defendant waived this issue because, although he objected to admission of the video at the revocation hearing, he did not object on the specific ground he now raises on appeal. We agree with the State.

As with probation revocation proceedings, community corrections sentence revocation proceedings are two-pronged: first, the trial court must determine, by a preponderance of the evidence, whether a defendant has violated the terms of his or her community corrections sentence; and if so, what consequences should apply upon revocation. *See State v. Dagnan*, 641 S.W.3d 751, 757 (Tenn. 2022); *see also State v. Harkins*, 811 S.W.2d 79, 83 (Tenn. 1991) ("Given the similar nature of a community corrections sentence and a sentence of probation, we hold that the same principles are applicable in deciding whether a community corrections sentence revocation was proper."). Both determinations are discretionary; as such, we review both determinations for an abuse

---

[4] We note that the trial court had the authority to resentence the Defendant for the original offense after revoking his community corrections placement. *See* Tenn. Code Ann. § 40-36-106(e). However, the trial court chose not to do so.

of discretion accompanied by a presumption of reasonableness, so long as the trial court places sufficient findings and its reasoning in support of its decisions for both prongs on the record. *Dagnan*, 641 S.W.3d at 758-59. Upon finding that a defendant has violated the terms of his or her community corrections sentence, a trial court may "resentence the defendant to any appropriate sentencing alternative, including incarceration, for any period of time up to the maximum sentence provided for the offense committed, less any time actually served in any community-based alternative to incarceration." Tenn. Code Ann. § 40-36-106(e)(4).

Generally, a trial court's ruling on the admission or exclusion of evidence will not be reversed unless the trial court abused its discretion. *See State v. Gomez*, 367 S.W.3d 237, 243 (Tenn. 2012); *State v. Banks*, 271 S.W.3d 90, 116 (Tenn. 2008). Under that standard of review, we will reverse a trial court's decision "only when the [trial] court applied an incorrect legal standard, or reached a decision which is against logic or reasoning," and the admission of the evidence "caused an injustice to the party complaining." *State v. Gilliland*, 22 S.W.3d 266, 270 (Tenn. 2000) (internal quotation marks omitted) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)).

It is well-settled law that appellate review is limited to issues properly preserved in both the trial court and on appeal. *See* Tenn. R. App. P. 13(b) ("Review generally will extend only to those issues presented for review."); *see also State v. Vance*, 596 S.W.3d 229, 253 (Tenn. 2020); *State v. Minor*, 546. S.W.3d 59, 65 (Tenn. 2018). "Appellate review preservation requirements ensure that the defense and the prosecution are afforded an opportunity to develop fully their opposing positions on an issue, and such requirements also enable a trial court to avoid or rectify an error before a judgment becomes final." *Minor*, 546 S.W.3d at 65 (citing *Puckett v. United States*, 556 U.S. 129, 134 (2009)).

To properly preserve an evidentiary issue for appellate review, a party must raise it via a timely and specific objection to the trial court, either before or during trial. *See* Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, *stating the specific ground of objection if the specific ground was not apparent from the context*[.]") (emphasis added); Tenn. R. Crim. P. 51(b)(2) (requiring a party to inform the court of any "objection to the action of the court *and the grounds for the objection*" in order to preserve an issue for appeal) (emphasis added). Thus, it is essential that a party seeking to preserve an evidentiary issue for appeal state with specificity the grounds for the party's objection, if such grounds are not apparent from the context.

However, once a party has asserted a specific ground for an objection to the admission of evidence during trial, it may not assert a different ground or theory to support

the objection in a motion for a new trial or on appeal. *State v. Adkisson*, 899 S.W.2d 626, 634-35 (Tenn. Crim. App. 1994). This conclusion logically follows when we consider that the purpose of requiring issue preservation is to "promote fairness, justice, and judicial economy by fostering the expeditious avoidance or correction of errors before their full impact is realized, and in this way, may obviate altogether the need for appellate review." *Minor*, 546 S.W.3d at 65. Simply put, if a party believes evidence is inadmissible for a specific reason, that party must give the trial court an opportunity to consider that specific legal principle or argument. Once the party does so, he may not later complain that the trial court should have sustained his objection on a different legal principle which the trial court was never asked to consider.

In the present case, Marilyn Kirchoff was reluctant to testify to the detriment of the Defendant during the revocation hearing. The trial court interrupted the witness on two occasions to remind her that she was under oath and to admonish her that her "efforts to try to assist continue to backfire." During direct examination, the prosecutor asked Marilyn Kirchoff if she remembered what she told the police the night of the incident. She answered, "[N]o, I do not recall every detail of that day." The prosecutor then asked her if it would help her to watch the officer's body-worn camera video, and she replied that she had already watched it twice and that she could tell that she was intoxicated in the video.

At that point, the prosecutor asked to borrow the trial court's equipment, ostensibly to play the officer's video. Defense counsel objected, arguing that the witness had already watched the video twice, that watching it again would not help her "recall anything", and that attempting "to help her refresh her recollection" was an "inadequate reason" to play the video. The prosecutor responded by citing Tennessee Rule of Evidence 613, arguing that the video was a prior statement of the witness, which she had the opportunity to explain and would "not answer the question as to whether or not she made a statement to the police officers."[5] The prosecutor also briefly referenced Rules 806, "which is attacking her credibility," and "803, for a prior inconsistent statement," without further explanation.

The trial court then gave the Defendant an opportunity to respond to the State's argument. The Defendant reiterated that Marilyn Kirchoff had been drinking that night, that she was not under oath at the scene, and that she said she did not remember what she told the officers. The Defendant then suggested that the State call the officer to the witness stand to introduce the video rather than have Marilyn Kirchoff testify about the video, because she did not remember what she had said. The prosecutor then argued Marilyn Kirchoff's inability to remember what she told the officers was "[a]ll the more reason to refresh her recollection[.]" The trial court ruled that it would be improper to bring the

---

[5] The court notes that the record does not indicate that Ms. Kirchoff was asked to explain any specific statement made to the officers prior to the admission of the video.

officer in to testify as to what Marilyn Kirchoff said at the scene, and that the prosecutor had cited the "more appropriate" Rules of Evidence. The officer's body-worn camera video was played and admitted as an exhibit to the hearing over the Defendant's objection.

Tennessee Rule of Evidence 613 governs the use of prior statements to impeach a witness. However, prior inconsistent statements may be considered only for the witness's credibility, not as substantive evidence of the truth of the matter asserted in the prior statement. *State v. Reece*, 637 S.W.2d 858, 860 (Tenn. 1982). On the other hand, Tennessee Rule of Evidence 803 contains two provisions by which hearsay statements may be introduced as substantive evidence. Introduction of a past recollection recorded is governed by Rule 803(5), and Rule 803(26) allows for the introduction of prior inconsistent statements where the trial court determines that a statement otherwise admissible under Rule 613 was made under circumstances indicating trustworthiness. It is unclear from the record which rule the trial court relied upon in admitting the statement as substantive evidence.

What is clear from the record is that the Defendant did not object on any of these grounds. From the statements of defense counsel and the context of the argument, the basis for the Defendant's objection to the video during the revocation hearing was that it was an improper refreshing of recollection. He argued that the witness had already viewed the video and that it did not refresh her recollection. Refreshing the present recollection of a witness is governed by Tennessee Rule of Evidence 612. If a witness's memory requires refreshing, the direct examiner must first establish the need to refresh recollection, then show the writing to the witness for review, then take the writing back from the witness, and then ask the witness to testify from their refreshed recollection. Tenn. R. Evid. 612, Adv. Comm'n Cmts. Thus, a prior statement is never introduced as substantive evidence under Rule 612.

However, the Defendant now argues that the recording was improperly introduced under Rule 613. Specifically, he claims that the trial court erred by allowing the video to be introduced without first declaring the witness to be hostile. As stated above, once a party has asserted a specific ground for its objection to the admission of evidence during trial, he may not assert a different ground or theory to support the objection on appeal. Therefore, we find that the Defendant has waived his sole appellate claim by failing to assert it during the revocation hearing.

Waiver notwithstanding, the Defendant's assertion that a witness must first be declared hostile before being impeached with a prior inconsistent statement is incorrect. He relies upon *State v. Stackhouse*, No. E2010-01972-CCA-R3-CD, 2011 WL 5620925 (Tenn. Crim. App. Nov. 18, 2011), *perm. app. denied* (Tenn. Mar. 7, 2012), to support this proposition. However, neither Rule 613 nor *Stackhouse* requires a witness to first be

declared hostile before they may be impeached with a prior inconsistent statement. Although the witness in *Stackhouse* had been declared hostile, the issue in that case was whether the party that called the witness to the stand could subsequently attack the witness's credibility with a prior inconsistent statement during the party's case in chief. The court did not hold in *Stackhouse* that a witness must be declared hostile before being impeached under Rule 613. To the contrary, the court stated that the proper foundation for impeachment under Rule 613 is to: "(1) provide the witness an opportunity to admit, deny, or explain the prior inconsistent statement; (2) refresh the witness'[s] memory; and (3) allow the witness to respond intelligently to the impeachment attempt." *Id*. at *9 (citing *State v. Rice*, 184 S.W.3d 646, 681(Tenn 2006)). Thus, a declaration as a hostile witness is not a prerequisite to the use of a prior inconsistent statement for the purposes of impeachment of a witness under Rule 613.

Furthermore, the Defendant has not requested plain error review. "When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time," under plain error review. Tenn. R. App. P. 36(b). Plain error review, however, is discretionary and should be sparingly exercised. *Banks*, 271 S.W.3d at 119; *State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007). Importantly, the appellant requesting relief of an unpresented or unpreserved issue has the burden of persuading the appellate court that plain error relief is warranted to correct the trial court's obvious error. *Bledsoe*, 226 S.W.3d at 355; *State v. Maddin*, 192 S.W.3d 558, 562 (Tenn. 2005). In light of this burden of persuasion, an appellant's failure to request plain error review weighs against consideration of an unpresented or unpreserved issue. *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023) (citing *State v. Cornwell*, No. E2011-00248-CCA-R3-CD, 2012 WL 5304149, at *18 (Tenn. Crim. App. Oct. 25, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013)), *no perm. app. filed*. This is especially true where, as here, a defendant requests relief on an unpresented or unpreserved issue, the State responds that such a claim is waived but, regardless, does not merit plain error relief, and the Defendant nevertheless neglects to respond to the State's waiver argument via a responsive filing. *See Thompson*, 2023 WL 4552193 at *5 ("Where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our *sua sponte* consideration of plain error."). Therefore, we will not consider this issue under a plain error analysis.

### III.     CONCLUSION

Following our review of the record and based upon the foregoing analysis, we affirm the judgment of the trial court.

S/ *STEVEN W. SWORD*_____
STEVEN W. SWORD, JUDGE